Civil Action No.: 1:22-cv-02567

PRINCETON JACKSON,

> Plaintiff,

v.

WELLPATH, LLC;
GEORGE SANTINI;
MICHAEL MOHR.

> Defendants.

---

## CIVIL RIGHTS COMPLAINT AND JURY DEMAND

---

Plaintiff, through his attorneys, Zachary D. Warren and Annika K. Adams of HIGHLANDS LAW FIRM, hereby submits this Complaint against all Defendants and requests a trial by jury as follows.

### I.     INTRODUCTION

1.     This is a civil rights action resulting from a series of events that occurred while the Plaintiff, a 32-year-old man who is paralyzed from the waist-down, was a pre-trial detainee at the El Paso County Jail ("EPCJ") in Colorado Springs, Colorado.

2.     Due to the serious nature of the Plaintiff's disability, he required medical assistance during his detention to complete necessary daily actions, including but not limited to, using the restroom.

3.  The Defendants knew the Plaintiff's disability and medical needs were severe from the moment he arrived to the EPCJ on a gurney. His paralysis was painfully visible, as he unequivocally could not walk on his own.

4.  During the Plaintiff's initial medical intake, a Wellpath employee ***placed alerts on his medical file*** for both Chronic Care and ADA/Special Needs, as it was understood to anyone that interacted with him that the Plaintiff's disabilities and medical conditions required a higher level of medical intervention and supervision relative to other detainees.

5.  Anyone who looked at Plaintiff's medical file would have seen these alerts and known that the Plaintiff was disabled due to his spinal cord injury and required tools and assistance to manage his serious medical needs, including the use of a catheter and enema.

6.  But Wellpath staff, including Defendants Santini and Mohr, wholesale failed to provide any meaningful care to the Plaintiff, who suffered immeasurably as a result.

7.  Not only was the medical treatment inadequate—it was also dehumanizing and degrading.

8.  Among other things, the Plaintiff was forced to ration catheters, leaving him without any means to relieve his bladder for very, very long periods of time.

9.  Just as bad, the catheters were the wrong size, causing extreme pain every single time he inserted or removed a catheter. As he stated in a written grievance:

> "THE CATHETORS I'M BEING GIVENARE NOT THE RIGHT ONES THERE IS CHUNCKS OF MY INSIDES AND BLOOD COMING OUT . . ."

10.  Similarly, medical providers refused to allow the Plaintiff access to enema supplies, which are necessary for him to have a regular bowel movement due to his previous spinal cord

injury; instead, he was forced to ***digitally remove his own feces*** because Wellpath and Defendants Santini and Mohr were unwilling to provide access to cheap, common, and readily-available medical supplies that are necessary for the Plaintiff to accomplish these basic tasks.

11. Defendant Wellpath was woefully inadequate in its supervision, training, and staffing at the EPCJ, which predictably resulted in the denial of adequate medical care to the Plaintiff for the entire duration of his confinement.

12. The Plaintiff, who was detained at the EPCJ for seventy-two days, unnecessarily underwent prolonged periods of severe pain, hospitalization, mental anguish, and severe and lasting complications due to the Defendants' unconstitutional actions.

## II. JURISDICTION AND VENUE

13. This action arises under the Constitution and laws of the United States and the State of Colorado. This Court has original subject matter jurisdiction over the Plaintiff's civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent state causes of action derive from a common nucleus of operative facts. Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

14. This Court has personal jurisdiction over all the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

15. Venue in the District of Colorado is proper under 28 U.S.C. § 1391(b) because all the events relevant to the claims contained herein occurred within the State of Colorado.

3

### III. PARTIES

16. At all times relevant to this Complaint, Plaintiff Princeton Jackson was a citizen of the United States and a resident of the State of Colorado. Plaintiff is a qualified individual with disabilities for the purposes of the ADA and Section 504. At all relevant times, Plaintiff was a pretrial detainee at the EPCJ.

17. Defendant Wellpath, LLC ("Wellpath") is a Delaware limited liability company doing business in Colorado. Its principal office street address is 1283 Murfreesboro Pike, Ste. 500, Nashville, TN 37217. Its registered agent is Corporate Creations Network Inc., 155 E. Boardwalk, #490, Ft. Collins, CO 80525. Wellpath was created by its parent entity, the private equity group HIG Capital, after HIG Capital acquired jail medical contractor Correct Care Solutions, LLC ("CCS") in 2018. Shortly thereafter, CCS and another jail medical contractor, Correctional Medical Group Companies, were merged by the parent HIG Capital to form Wellpath.

18. At all times relevant to this Complaint, Defendant Wellpath contracted with El Paso County to provide medical and mental health care at the EPCJ.

19. At all times relevant to this Complaint, Defendant George Santini was a citizen of the United States and a resident of Colorado. At all times relevant to this complaint, Defendant Santini was employed by Wellpath as the medical provider for the EPCJ.

20. At all times relevant to this Complaint, Defendant Michael Mohr was a citizen of the United States and a resident of Colorado. At all times relevant to this complaint, Defendant Mohr was employed by Wellpath as a nurse practitioner for the EPCJ.

## IV.    FACTUAL ALLEGATIONS

21.    The Plaintiff is a 32-year-old man who is paralyzed as a result of a spinal injury he sustained years prior to his incarceration at the EPCJ.

22.    It is plain and obvious to anyone—layperson or medical provider—that the Plaintiff is paralyzed based on his use of assistive devices and severe atrophy in his lower extremities.

23.    On February 3, 2022, Plaintiff was escorted via American Medical Response to the EPCJ following his arrest by Colorado Springs Police Department officers.

24.    Plaintiff was brought to the pre-admit area within the EPCJ on a gurney due to his disability and medical condition.

25.    Upon his arrival, the Plaintiff, who was experiencing severe pain and discomfort, requested to be taken directly to the medical unit due to his condition and out of concern for potential injuries sustained during his arrest.

26.    Deputies instead brought the Plaintiff a wheelchair and told him he needed to complete the booking process before he could be seen by medical.

27.    During the booking process, deputies were informed by medical staff that the Plaintiff was paralyzed and required the use of a wheelchair and other assistance.

28.    Deputies proceeded to physically lift the Plaintiff from the gurney, transported him into a booking cell, and placed him on the floor, where he indicated to officers that he was in severe pain due to his spinal injuries.

29.    The deputies noted in incident reports that his complaints of pain appeared to be genuine and alerted Wellpath medical personnel.

30.    Plaintiff was then transported via wheelchair to his cell.

31. Immediately upon arriving to his cell, Plaintiff again requested medical attention. A Wellpath employee came to Plaintiff's cell to inquire about his condition and pain and told Plaintiff he would be scheduled for an appointment with the doctor.

32. During the Plaintiff's medical intake on February 3, 2022, Wellpath staff noted his paralysis. Notably, Wellpath intake staff placed alerts on the Plaintiff's file for both (1) Chronic Care and (2) ADA/Special Needs.

33. During the same intake process, the staff indicated that his medical needs were so severe that his referral status for follow-up was: "Urgent (Tomorrow)".

34. Despite the representation to the Plaintiff, the notations on his medical intake forms, and alerts placed on his medical file, the Plaintiff did not meet with any Wellpath employee or medical provider until February 17, 2022 – *fourteen days after his arrival to the EPCJ*.

35. Unfortunately, this marked lack of responsiveness and care on the part of Wellpath medical staff reflects the broader indifference to the Plaintiff's serious medical needs that extended throughout the entire course of his confinement, resulting in unnecessary pain, suffering, and likely permanent physical injuries.

36. In fact, during his 72-day incarceration at the EPCJ, the Plaintiff, a disabled paraplegic with several serious medical needs, had only three medical appointments with Wellpath medical providers, and never received an appointment or consult with Wellpath medical providers to address his "Chronic Care" or "ADA/Special Needs," which Wellpath employees identified and understood to be "Urgent" during his initial medical screening.

37. Moreover, Defendant Dr. George Santini, the head of medical within the EPCJ, who was directly and personally responsible for addressing the medical needs of "Chronic Care"

detainees, never even met with the Plaintiff, despite actual knowledge, as described in more detail below, that the Plaintiff had serious medical needs, was experiencing acute distress, and ultimately developed infections (based on the lack of medical care and adequate supplies) that put him at known acute risk of serious injury or death.

38.     Based on Plaintiff's medical records and the verbal representations of certain Wellpath employees and deputies within the facility, part of the problem relative to the provision of healthcare services in the EPCJ is attributable to acute staffing failures on the part of Wellpath.

39.     As one such example, the Plaintiff's own medical records reveal that he (and presumably other detainees) could not access their prescription medications at certain times because there were literally not enough medical providers to physically handout the medications:

| 03-06-2022 2:45 pm | Other | medication was not given due to critical staffing, only having one person to pass meds for the entire jail. | Payne, Nathan |
|---|---|---|---|

40.     Upon information and belief, Defendant Wellpath's staffing failures were a moving force in the denial and/or delay of medical care to Plaintiff on multiple other occasions, including the Plaintiff's inability to receive necessary medical supplies or otherwise meet with a mid-level prescriber or physician to have his serious medical needs addressed.

41.     For example, Wellpath employees' responses to the Plaintiff's kites conveyed no sense of urgency to provide medical care, and no regard for the Plaintiff's need to have both his chronic medical conditions and acute medical emergencies addressed.

42.     When Wellpath employees did schedule sick call appointments in response to the Plaintiff's concerns, the appointments were scheduled well into the future, forcing the Plaintiff to wait for extended periods of time to receive any semblance of medical care.

43. During one appointment, Wellpath employee Defendant Michael Mohr told the Plaintiff that he "had a lot of people to care for," when the Plaintiff raised concerns about not seeing a doctor or receiving necessary medical care.

44. Prior to being booked into the EPCJ, the Plaintiff attended a physical rehabilitation facility and achieved mobility with the assistance of a walker, only reserving wheelchair use in limited instances because long-term wheelchair use can cause or increase atrophy, or muscle deterioration.

45. Instead of ensuring the Plaintiff received a walker and leg brace, the Defendants confined him to wheelchair use, which did in fact cause more extensive atrophy in his legs.

46. Defendant Wellpath and its staff were wholly unprepared to care for a disabled individual with chronic health needs, and as a result, the Plaintiff experienced persistent issues, and was unable to properly catheterize or have a bowel movement, developed bed sores, and did not receive his medications, a leg brace, a walker, or proper footwear.

### *Wellpath Failed to Provide Plaintiff Adequate Medical Care to a Paralyzed Individual for Seventy-Two Days*

47. As noted above, the Plaintiff is paralyzed, and cannot relieve himself without the assistance of certain tools, and in some instances, a nurse's aid.

48. Specifically, the Plaintiff requires a catheter and lubricant to urinate and an enema to have bowel movements.

49. Prior to being booked into the EPCJ, the Plaintiff catheterized himself four to six times per day and used an enema every day.

50.     Despite knowing that the Plaintiff unequivocally could not use the restroom without these tools, over the course of his 72-day detention, the Defendants did not adequately provide them, causing the Plaintiff to suffer from physical pain and discomfort, mental anguish, develop complications, and putting him at substantial risk of serious harm.

51.     During his 72-day detention, the Plaintiff fell victim to severe staffing issues within the EPCJ, often going hours without being able to urinate when he needed to, developing infections, and developing constipation, diarrhea, fecal impaction, and other issues related to having bowel movements.

52.     In addition to these issues, prior to being booked into the EPCJ, the Plaintiff took several medications to manage chronic medical conditions associated with his paralysis.

53.     Among these medications were Gabapentin, to alleviate severe nerve pain, and Duloxetine, for the Plaintiff's depression and PTSD stemming from his accident a few years prior.

54.     Despite submitting multiple kites to Wellpath staff that he was not receiving these medications, or any substitutes, the Plaintiff never received any medications to manage these chronic health needs during the entire duration of his confinement.

55.     As a result of this failure, the Plaintiff experienced nerve pain which was so chronic and severe that it prevented him from sleeping at night.

56.     Additionally, the Plaintiff's forced sudden withdrawal from Gabapentin caused him to have nightly seizures on multiple occasions, which Wellpath employees, including Defendant Mohr, knew of through the Plaintiff's kites and communications with the Plaintiff, but did nothing to treat.

57.     As a result of being denied Duloxetine, and in fact any mental health medications, the Plaintiff's mental health also suffered, as his PTSD and depression went unchecked.

58.     Plaintiff's repeated cries for help were met with no sense of urgency on the part of Wellpath and its staff. When the Plaintiff begged for medical care, if appointments were scheduled at all, the Plaintiff was forced to wait several days despite experiencing medical emergencies.

59.     Wellpath employees, acting on Defendant Santini's instructions, rescheduled at least one appointment indefinitely because Defendant Santini was not present in the facility.

60.     On February 7, 2022, four days after being admitted to the EPCJ, the Plaintiff had still not seen a Wellpath employee beyond his initial medical intake.

61.     In a grievance submitted on the same date, the Plaintiff explained that he was only given a catheter two times per day, which meant that he frequently had to hold his bladder for up to twelve hours at a time and was at risk of developing sepsis and other infections.

> STILL HAVENT REICEVED ANY MEDICAL TREATMENT NO MEDS NO CATHETORS THE CATHS THEY PROVIDED ARE TOOBIG MY PENIS IS BLEEDING FROM THESES CATHS I ALSOHAVE BED SORES ALL OVER ME SINCE BEING HERE IAM ONLY GETTING 2 CATHS A DAY WHEN I SHOULD GET ONE EVERY 4 HOURS WHICH CAN CAUSE ME TO BECOME SEPTIC  AND CAUSE PERMANENT DAMAGE I ALSO AM BEGING TO GET DROP FOOT WHICH CAN BECOME PERMANENT  I NEED EMMEDIATE MEDICAL ATTENTION
>
> 2/7/2022 5:43:00 PM

62.     Unfortunately, this issue went unaddressed. Throughout the course of his detention, the Plaintiff had to hold his bladder for extended periods of time such that he was unable to drink water because his bladder was too full and doing so further risked developing infections, resulting in the Plaintiff experiencing prolonged and dangerous periods of dehydration.

63.    The Plaintiff was often unable to access any catheters or was allowed to use a catheter only once or twice per day, while the typical recommended usage is four to six times per day.

64.    As if forcing the Plaintiff to hold his urine for twelve hours or more per day was not troubling enough, the catheters provided to him were too large, *which almost invariably caused urethral bleeding and chunks of flesh to rip away from his penis when he removed the catheters*.

65.    Because the use of intermittent, single use catheters is common and using the wrong size catheter can cause serious harm, these types of catheters come in a variety of sizes, called "French sizes."

66.    The French size corresponds to the size of an individual's urethral opening, where the catheter is inserted to drain the bladder.

67.    Despite knowing the Plaintiff, who submitted several kites on this issue, was bleeding and experiencing severe pain owing to the chunks of flesh that would adhere to the catheter upon removal, the Defendants continued to provide him with catheters that were too large because they lacked adequate supplies and failed to timely – or ever – order appropriate catheters.

68.    In fact, even a basic Google search reveals that a medical supplier in Colorado Springs – located just minutes from the EPCJ – carried six different adult French sizes, not to mention all manner of other sizes for a variety of individuals ranging from infants to individuals with atypical anatomy, and offered same-day delivery for inexpensive 100-packs of intermittent catheters.

69. The Plaintiff's repeated requests for appropriate catheters were not unusual, unreasonable, or attributable to abnormal anatomy.

70. Had the Defendants wanted to obtain the correct catheters for the Plaintiff, they could have done so with very little effort.

71. Instead, the Defendants sat idly by while the Plaintiff sustained injuries and suffered excruciating pain to his urethra and penis while ignoring his pleas for help and requests for appropriate catheters.

72. In addition, Wellpath staff gave the Plaintiff catheters which he had to insert while standing, and provided no assistance despite knowing the Plaintiff had very, very limited use of his lower extremities.

73. As a result, each time the Plaintiff used a catheter, he had to prop himself up against a bathroom wall so the urine drained into the toilet, using one hand to insert the catheter and the other to steady himself from falling down; otherwise, the Plaintiff risked soiling himself while attempting to drain his bladder and sitting in his wheelchair.

74. As a result of the Defendants' actions and inactions, the Plaintiff spent seventy-two days in constant fear of urinating because he knew it would necessarily mean continuously injuring his penis and inflicting pain on himself.

75. On February 10, 2022, the Plaintiff needed to use the restroom and asked for a catheter at noon, but was not provided with one until midnight, twelve hours later, meaning the Plaintiff could not urinate despite needing to for twelve hours.

76. On February 11, 2022, the Plaintiff sent a kite to Wellpath staff putting them on alert that chunks of his penis were being torn off and he was experiencing bleeding due to being

12

given catheters that were too large, and that he had not had a bowel movement since arriving at the EPCJ because he had not been provided an enema.

77. In this same kite, the Plaintiff also explained that he had developed fecal impaction, writing "I NEED ENIMAS AND TO HAVE MYB ASS LITERALLY CLEARERD THE DAYS KEEP GOING BY WITH NOASSISTANCE A AT ALL (sic)."

> STILL HAVE YET TO SEE ANY DOCTOR OR NURSE MY NERVE PAIN IS TO SEVIERE IT MAKES MY WHOLE BODY SHAKE AND ME NOT HAVING MY MEDS IS MAKING ME HAVE SIEZURS AT NIGHT THE CATHETORS IM BEING GIVENVARE NOT THE RIGHT ONES THERE IS CHUNCKS OF MY INSIDES AND BLOOD COMING OUT OF MY PENIS FROM THESES CATHETORS IMNBEING GIVEN ITS BEENNOVER A WEEK IVE HADABSOLUTLY NO MEDICAL ATTENTION WHAT SO EVERE I STILL HAVENT HAD BOWEL MOVEMENT BECAUSE I NEED NURSE TO HELP ME WITH THATCAS WELLNI TOLD NURSES UPON ARRIVAL THAT I CAINT POOP ON MYOWN I NEED ENIMAS AND TO HAVE MYB ASS LITERALLY CLEARERD THE DAYS KEEP GOING BY WITH NOASSISTANCE A AT ALL
>
> 2/11/2022 11:29:00 AM

78. Again, on February 11, 2022, the Plaintiff wrote to Wellpath pleading to be given more catheters, wrote that he was bleeding from using the wrong catheters, and explained that he could not have a bowel movement without a nurse's help.

79. Specifically, the Plaintiff wrote that he felt "LIKE IM BEINGVTORTURED THIS IS NOT RIGHT AT ALL (sic)" and "I NEED THE RIGHT MEDICAL CARE BEFORE IT TURBS INTO PERMANT LIFE THREATING SITUATIOUNS (sic)".

MY SITUATION IS GETTING WORSE BY THE DAY SOME DAYS I MUST WAIT 8 TO 12 HOURS BEFORE THEY BRING CATHETORS UP SO I CAN PEE I ASKED FOR CATHAROUND NOON YESTERDAY DIDNT ACTUALLY GET THEMNUNTILL MIDNIGHT IM STILL BLEEDING FROM USING WRONG CATHS IM HAVING SIEZURES AT NIGHT FROM NOT HAVING MY MEDICATION AND I CAINT POOP WITHOUT HELP FROM NURSE I FEEL LIKE IM BEINGVTORTURED THIS IS NOT RIGHT AT ALL THIS IS THIRD OR FORTHBTIME OF ME REACHING OUT WITH ABSOLUTLY NO ASSISTANCE AT ALL I TOLD THE NURSE I WAS GETTINGVPRESSURE SORES ON MY BACKVAND BUT FROM SITTING ON CEMENT IN BOOKING FOR 48 HOURS SHE PROCEEDED TO TELL ME THAT WAS ABOVE HER PAY GRADGE I NEED THE RIGHT MEDICAL CARE BEFORE IT TURBS INTO PERMANT LIFE THREATING SITUATIOUNS

2/11/2022 11:40:00 AM

80. The Plaintiff, despite repeatedly telling the Defendants he needed an enema and without one would continue to be unable to have a bowel movement, was never provided one for 72 days.

81. In fact, over the course of his detention, the Plaintiff became so constipated that he developed severe fecal impaction.

82. The risks of fecal impaction—particularly in patients with other chronic or complex medical needs—are severe, including urinary tract obstruction, rectal bleeding, dehydration, perforation of the colon, and death.

83. When the Plaintiff asked for help, one nurse told him enemas were considered contraband and would not be authorized, while another nurse told him that handling the issue was "above my pay grade," indicating that the level of care necessary to address this issue was for higher-level medical providers, like Defendants Santini and Mohr.

84. Digital removal of fecal impaction is extremely dangerous, as it can cause rectal perforation and other life-threatening injuries if not completed by a trained medical professional.

85. Despite knowing the risks associated with fecal impaction and digital removal, instead of providing Plaintiff an enema or assisting him by digitally removing the impaction, over the course of several weeks, Wellpath employees merely provided Plaintiff with latex gloves to "handle it himself."

86. Wellpath staff prescribed the Plaintiff iron pills, fiber pills, and laxatives, which, when taken by the Plaintiff, only resulted in more impaction and overflow of watery stool.

87. When the Plaintiff complained that what he required to have a proper bowel movement was not pills or laxatives but enemas, Wellpath staff informed him that he could not have one.

88. On February 17, 2022, fourteen days after arriving at the EPCJ, the Plaintiff was finally seen by Defendant Mohr for a sick call appointment in response to kites submitted on February 11, 2022.

89. The Plaintiff hoped to discuss with Defendant Mohr the persistent and serious issues with his medical care, including injuries, pain, and discomfort due to the incorrect size and infrequency catheters given to him, inability to have a bowel movement without an enema, and bed sores, among other issues.

90. During this appointment, Defendant Mohr failed to meaningfully address any of the Plaintiff's concerns.

91. While Defendant Mohr did authorize the use of a leg brace and proper foot ware for the Plaintiff, he did nothing to ensure the Plaintiff received these tools, and as a result, the Plaintiff was confined to a wheelchair for the duration of his detention, which resulted in increased and lasting atrophy.

92. Regarding the Plaintiff's concerns about catheters and enemas, Defendant Mohr told the Plaintiff he had "a lot of people to take care of" and cut the appointment short due to the Plaintiff "getting argumentative."

93. Put into context, Defendant Mohr learned that the Plaintiff had not had a bowel movement in *more than two weeks,* that chunks of the Plaintiff's penis were being torn off each time he used a catheter, and that the Plaintiff was not receiving an adequate number of catheters or lubricant, yet took no meaningful actions to address the excruciating pain and emotional distress the Plaintiff was suffering.

94. On February 20, 2022, the Plaintiff requested a catheter. The Plaintiff was met with the same response the Defendants routinely gave him: to hold his bladder. After ten hours, the Plaintiff was finally given a catheter to relieve himself, but because he was forced to hold his urine for an extended period of time, on this day and most others, he developed an infection and experienced severe physical pain and discomfort and mental anguish.

> YESTERDAY I WAS TOLD THERE WASBNO CATHATORS I HAD TO HOLD BLADDER FORN10 HOURS THEN WAS BROUGHT ONE CATH AT MIDNIGHT THEN ASKED FOR ANOTHER CATH AND HAD TO WAIT UNTIL 9 AM TO GETNANOTHER ONE WHICH CAUSED METO DEVELOP A UTI IT IS NOT HUMANE TO HAVE TO HOLD MY URINE IN FOR 10 HOURS AT A TIMEITS CAUSING HEALTH ISSUES THAT SEEM TO FLL ON DEAF EARS THERE ISNBEING NOTHING DONE FOR MY HEALTH ISSUES AND I WILL BE SURE TO KEEP DOCUMENTATION OF EVERYTHINGN
>
> 2/21/2022 3:55:00 PM

95. On February 21, 2022, the Plaintiff sent a kite to medical writing that he developed a urinary tract infection due to having to hold his bladder almost daily for twelve hours at a time because he was being refused an adequate number of catheters.

I HAVE DEVELOPED A UTI DUE TO MEDICAL
STAFF REFUEING TO BRING UP CATHATORS I
AMNBEEING FORCED TO HOLD BLADDER FOR 12
HOURS AT A TIME AND MEDICAL IS DOING
NOTHING FOR MEDICAK ISSUESSI NEED
MEDICAL ATTENTION I HAVE UTI DUE TO
MEDICAL STAFF  NOT DOING THEIR JOB WHICH
IS ALL BEING DOCUMENTED THIS IS CRUEL AND
INHUMANE

2/21/2022 4:00:00 PM

96. Upon information and belief, during this time, Wellpath had a lack of even the most basic and necessary medical supplies on-hand at the facility, and Wellpath medical providers simply told the Plaintiff to "hold it" until more could be ordered.

97. By February 22, 2022, the Plaintiff's pain became so severe that he was sent to an outside facility, UC Health Memorial Hospital, but only because EPCSO deputies thankfully recognized that the Defendants were not meeting his serious medical needs and forced the issue.

98. As one Wellpath staff member noted in the Plaintiff's medical records: "Pt was sent to memorial hospital at 2030 d/t needing a straight cath for neurogenic bladder and we do not have Any in the building. Received a foley cath at hospital and also was dx with acute cystitis and hematuria."

99. Put into context, the Plaintiff suffered at the EPCJ for almost three weeks and developed an infection because the Defendants wholesale failed to provide any semblance of meaningful healthcare despite their own, internal records indicating a referral and care plan was "Urgent (Tomorrow)," while also failing to provide even the most basic medical supplies.

100. As a result of the Defendants' failures, upon being admitted to UC Health Memorial Hospital on February 22, 2022 – *five days after being seen by Defendant Mohr* – the Plaintiff was diagnosed with acute cystitis with hematuria, a symptom of a urinary tract, bladder, or kidney infection.

101. In addition to being painful and distressing, it is well-understood among medical providers that such infections—particularly kidney infections—carry serious risks, including death, and especially for individuals with other complex medical needs such as spinal injury.

102. Had Defendant Mohr taken any steps to address the Plaintiff's complaints of pain and blood in his urine a few days prior, the Plaintiff would not have undergone additional days of suffering.

103. If treated early, these types of infections can be addressed with cheap and readily-available oral antibiotics, preventing any potential spread of infection and eliminating unnecessary suffering.

104. Instead, Defendant Mohr, based on the representations of the Plaintiff and the medical records, failed to address the problems surrounding the Plaintiff's urinary tract issues, including bloody discharge, inability to evacuate his bladder, and other symptoms clearly indicating an urgent and acute risk of kidney infection, while also failing to address the Plaintiff's bowel issues, leaving him to suffer without any method of evacuating his bowels, and terminated the appointment.

105. During his February 22, 2022, hospitalization, the Plaintiff was given a Foley catheter, which is a type of catheter that stays inserted in a patient's urethra and collects urine in a bag attached to the body. This type of catheter is also known as an indwelling catheter.

106. Foley catheters require medical supervision and monitoring and should be changed out every few days.

107. The Plaintiff, who had been utilizing single-use catheters for three years, was unaccustomed to utilizing an indwelling urinary catheter.

108. When the Plaintiff returned to the EPCJ following his February 22, 2022, hospitalization, the Defendants failed to provide any follow-up care to him or otherwise alleviate the risk of any further complications.

109. In the absence of follow-up care for days following the insertion of his indwelling catheter, the Plaintiff began developing additional signs of local infection, urinary tract infection, and kidney infection, along with bloody discharge from his penis.

110. The Plaintiff was ultimately forced to remove the Foley catheter himself after Wellpath medical providers failed to provide any meaningful supervision or monitoring despite the Plaintiff's requests for help.

111. Indwelling catheters are secured following insertion into the penis by inflating a small balloon, which ensures that the catheter does not fall out inadvertently. When the Plaintiff was forced to remove the indwelling catheter without supervision or assistance due to his acute infection, it required him to pull the inflated balloon through his urethral opening, which is extraordinarily painful.

112. While the Plaintiff has a spinal cord injury that limits his motor skills in his lower body, he experiences normal sensations (including pain) in his penis and gastrointestinal system, meaning that the pain and suffering he endured were not mitigated in any way by his prior injuries.

113. On February 24, 2022, Defendant Santini reviewed and signed off on the Plaintiff's records from UC Health Memorial Hospital, which noted the following diagnoses: acute cystitis with hematuria, neurogenic bladder, urinary catheterization causing abnormal reactions/complications, and elevated blood pressure.

114. Defendant Santini knew the Plaintiff was experiencing severe issues with his catheters and had developed an infection requiring hospitalization. He was similarly aware that the Plaintiff was referred for an "Urgent (Tomorrow)" medical referral, including developing a "Chronic Care" plan and "ADA/Special Needs" plan, which had not been completed, and which were the responsibility of the Medical Director. Further, based on the internal policies of Wellpath and the medical records, it is clear that Defendant Santini was aware that failure to complete these tasks and address the immediate needs of the Plaintiff could result in serious physical harm or death. Finally, it is clear that Defendant Santini, based on timestamps on the Plaintiff's medical records, was aware that the Plaintiff was unable to access basic medical supplies—including catheters, lubricants, and enema materials—and certain medications to treat the Plaintiff's complex health issues, including his seizure disorder, that carried an extreme risk of serious bodily injury or death.

115. Even so, Defendant Santini, despite holding responsibility for developing a Chronic Care plan and an ADA/Special Needs plan, never saw the Plaintiff during the entire seventy-two-day period of his incarceration, notwithstanding Wellpath's own determination that such a meeting was "Urgent (Tomorrow)," the Plaintiff's subsequent hospitalization, and the Plaintiff's numerous written medical requests.

116. The Plaintiff's first Chronic Care Clinic appointment with Defendant Santini was scheduled for March 17, 2022 – *over one month after the Plaintiff was booked into the EPCJ* – and was canceled the day before the appointment date because Defendant Santini was not going to be present at the jail that day.

117. The appointment was delayed indefinitely, and as a result, the Plaintiff never interacted with Defendant Santini, despite the fact that Defendant Santini was actually aware of the Plaintiff's acute medical needs, the failures of Wellpath staff to meet those needs, and the independent determination of the Wellpath intake staff member who created an alert in the medical records indicating that a referral to a physician was "Urgent (Tomorrow)."

118. Not seeing Defendant Santini necessarily meant the Plaintiff received no Chronic Care during his entire confinement. Similarly, the Plaintiff received no ADA/Special Needs plan to address his known and serious medical conditions.

119. The Plaintiff was also routinely denied adequate lubricant, a necessary tool to ensure proper, hygienic, and safe catheter use.

120. On March 8, 2022, the Plaintiff asked an EPCSO deputy for lubricant. However, the deputy told the Plaintiff there was none and that he would have wait.

> YESTERDAY ON THE EIGHTH OF MARCH I WAS TOLD BY FIRST SHIFTVOFFICER THERE WAS NO LUBRICATION TO USE WHILE IVCHATHEDXSO THERE FOR I COUKDNT CATH MEDICAL WAS CALLED AJDNI WAS TOLD TO WAIT THIS WASBAT 4 OCLOCK IN THE EVENING I WQITED ANDBHELD MY PISS FOR 7 HOURSBAND ASKED THE NEXT OFFICER ONBTHE NWXT SHIFTVWHILE THE MEDICAL PEOPLEBWAS UPNHERE IN THE WARD THEY TOLD ME I NEEDED TONWAIT UNTIOL IBWASBTOOKNTOONMEDICALTHAT WAS AT 11 AT NIGHT I HELD MY PISS ANOTHER 6 HOURS AND TOLD THE DEPUTY THAT I COULD NO LONGER HOLD MY BLADDER AT 5 OCLOCK INNTHE MORNING IBWAS BROUGHT A SINGLEBUSE LUBRICANT AND I WAS TOLD THAT I NEEDED TO SAVE THE LUBRICANT AND REUSE IT EVENBTHONTHEBPACKAGEVSAYD NOT TO REUSE
>
> 3/9/2022 1:53:00 PM

121. After over twelve hours, the deputy brought the Plaintiff a single-use lubricant packet from medical and told the Plaintiff he needed to ration it, despite the single-use warning on the package label.

122. Upon information and belief, Wellpath staff ran out of proper lubricant and instead forced the Plaintiff to use single-use Vaseline packets for the Plaintiff to ration for three days at a time.

123. The packets, once opened, were susceptible to contamination and risked infection to the Plaintiff.

124. This incident caused the Plaintiff significant emotional distress, as it further increased the Plaintiff's chances of developing another urinary tract infection and caused the Plaintiff unnecessary pain and suffering.

125. Defendants knew that improper catheter use can result in urinary tract infections, bladder infections, kidney infections, and urethral scarring, and further, that the Plaintiff had in fact suffered from these complications at the EPCJ.

126. On March 9, 2022, the Plaintiff wrote that "THIS IS LIKE TORTUEE MY NERVE PAIN IS KILLINGVME EVERYDAY IVE NOT BEEN IN THIS MUCH PAINBSINCE MY ACCEDENT (sic)" when describing the conditions of his confinement due to the Defendants' actions and inactions.

USNG THIS LUBRICATION THATS CLEARLYVNOT STERILE IS CAUSINGVME TO GET ANOTHERCUTI CSHOULD HAVE TO SUFFER BECAUSE THIS FACILITY DOESNT HAVE THE CORRECT EQUIPMENT OR PERSONELNTODEAL WITHVA PERAPALEGANTVINMATEI STILLBHAVE YET TO RECIEVE ANYVOF THEC10 MEDICEINESCPERSCRIBED TO ME BY MYVDOCTOR THIS IS LIKE TORTUEE MY NERVE PAIN IS KILLINGVME EVERYVDAY IVE NOT BEEN IN THIS MUCH PAINBSINCE MY ACCEDENT I HAVENT SEENBA DOCTOR AT ALL SINCE MY TRIPBTO THE HOSPITALB

3/9/2022 2:02:00 PM

127. Instead of meaningfully addressing these issues, during a March 16, 2022, sick call appointment, Wellpath employee Xiamar Hudson merely treated the Plaintiff's bed sore and

provided no medical care or counseling for the multitude of problems with the Plaintiff's catheters or gastrointestinal distress.

128. Unsurprisingly, the Plaintiff continued to experience pain and was at risk of developing infections and other complications due to issues with his catheters following the appointment with Mr. Hudson.

129. On April 6, 2022, the Plaintiff saw Wellpath employee Pam Dobyns for a sick call appointment after he had been experiencing pain in his kidneys for one week.

130. Upon information and belief, a urinalysis completed during this appointment revealed the Plaintiff had developed another infection requiring antibiotics.

131. On April 9, 2022, the Plaintiff wrote another kite describing the painful injury and bleeding caused by being given catheters that were too large during the sick call appointment with Ms. Dobyns.

> 04-07-2022  MEDICAL GAVE ME THE WRONG SIZE CATHETORS THEY ARE TO BIT THEY RIP MY DICK HOLE ANDVMAKE ME BL3EETHIS IS JOT THE FIRST TIME THIS HAS HAPPEND KEDICAL JUST TRIEN TO GIVE ME WHATS CONVIENIANTVTO THEM AND NOT WHATS MEDICALYVVCORRECT I NEED THE CORRECT CATGETORS SO IM NOT IN PAIN AND DISCONFORT
>
> 4/9/2022 5:03:00 PM

132. On April 15, 2022, the Plaintiff returned to his cell from sitting in a court-holding cell for twelve hours without the ability to urinate. Deputies informed him that this issue—needing medical supplies to urinate—was exclusively up to the medical providers at Wellpath and that he would have to address the issue with them, but, as described throughout this Complaint, Wellpath was unwilling to provide the necessary interventions to care for the Plaintiff.

133. In sum, over the course of seventy-two-days, Defendants made Plaintiff suffer excruciating pain, put him at substantial risk of complications relative to his spinal injury, failed to prevent repeated and dangerous infections (which ultimately required hospitalization), and left him with severe damage to his penis, urinary tract, and gastrointestinal system, which persist to this day.

134. The Defendants' decisions were made with full understanding of their potential consequences and the risks to the Plaintiff, evidenced by the willful decisions of Defendants Santini and Mohr to ignore the "Urgent (Tomorrow)" alerts *that were implemented by Wellpath's own staff at intake*, the Plaintiff's numerous grievances, and the medical records reviewed by each of the Defendants during the Plaintiff's 72-day incarceration.

135. Wellpath chronically understaffed the EPCJ and failed to ensure adequate supplies were maintained at the facility due to financial incentives to provide low-cost medical care to the detriment of the Plaintiff.

136. Part of this staffing failure is animated by Wellpath's wide-spread and well-documented practice of offering relatively low compensation to medical providers in an effort to drive profits, which, in turn, inhibits its ability to recruit and retain high quality staff and physicians.

137. The chronic failure to adequately staff and maintain supplies caused the Plaintiff to develop infections, fecal impactions, urethral bleeding, ulcers, seizures, and nerve pain, while also failing to treat other known and serious conditions, including his seizure disorder.

138. Prior to the incidents described in this Complaint, the Plaintiff achieved significant progress in his rehabilitation following his initial spinal cord injury, even progressing to using a

walker and leg brace to ambulate instead of a wheelchair. He also made very significant progress relative to his ability to successfully and safely evacuate his bladder and bowels.

139. As a result of the Defendants' actions and inactions, the Plaintiff severely regressed in each of these domains, and still experiences acute issues with his urinary tract, gastrointestinal system, and severe atrophy in his lower extremities such that he is almost entirely limited to using a wheelchair.

### *Wellpath Has a Well-Documented Pattern of Providing Inadequate Medical Care*

140. The consistent and pervasive failures of Wellpath in this matter are not an isolated incident; to the contrary, they represent only an example of a well-documented pattern and practice of failing to provide adequate medical care to pretrial detainees and incarcerated persons, largely owing to perverse financial incentives attendant to the contracts negotiated between municipalities and Wellpath.

141. At all relevant times, Wellpath was a national company with a demonstrated and systemic pattern of failing to provide constitutionally adequate medical care to individuals in custody.

142. There are countless examples in Colorado, including within the EPCJ, and nationwide, establishing that Wellpath is deliberately indifferent in its policies, customs, and practices with respect to the medical needs, and constitutional rights, of inmates and detainees.

143. In *Pintos-Rios v. Brown, et al.*, Case No. 1:20-cv-03698-SKC (D. Colo.), a case currently pending in the United States District Court for the District of Colorado, a pretrial detainee sued Wellpath for deliberate indifference after he developed severe dehydration, acute renal

failure, necrosis, and dry gangrene due to frostbite when medical personnel failed to provide timely and adequate medical treatment over the course of several days.

144. In *Estate of John Kowalski v. Shrader, et al.*, Case No. 1:21-cv-00827-NYW, a case currently pending in the United States District Court for the District of Colorado, the estate of a pretrial detainee brought suit against Wellpath for deliberate indifference after Wellpath employees failed to check on Mr. Kowalski or provide timely and adequate medical treatment for opioid withdrawal, ultimately resulting in his death.

145. In *McGill v. Correctional Healthcare Companies, et al.*, Case No. 1:13-cv-01080-RBJ-BNB, Kenneth McGill sued Correctional Healthcare Companies (now Wellpath) for its deliberately indifferent failure to provide medical treatment while he exhibited signs of a stroke. Wellpath employees refused and/or failed to respond to Mr. McGill's obvious medical emergency. At trial, the jury awarded Mr. McGill approximately $11 million, finding that CHC/Wellpath had unconstitutional policies or informal customs regarding their response to medical emergencies, and that it had constitutionally deficient training and supervision of its employees.

146. On information and belief, an individual died in the EPCJ earlier this year because Wellpath failed to administer his medications in a timely manner, likely owing to the gross staffing failures identified in the Complaint.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment Violation
### Failure to Provide Medical Care and Treatment
### (Against Defendants Santini and Mohr)

147. Plaintiff hereby incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

148. At all times relevant to the allegations in this Complaint, Defendants were working under color of state law.

149. Plaintiff is a citizen of the United States and all of the Individual Defendants are persons under 42 U.S.C. § 1983.

150. Plaintiff had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to his known serious medical needs.

151. Defendants Santini and Mohr knew or should have known of this clearly established right at the time of the incidents described in this Complaint.

152. At all relevant times, Defendants Santini and Mohr knew of and disregarded the excessive risks associated with the Plaintiff's serious medical needs.

153. Nevertheless, with deliberate indifference to the Plaintiff's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants Santini and Mohr knowingly failed to examine, treat, and/or care for the Plaintiff's disability and associated medical needs. They did so despite their knowledge of the Plaintiff's serious medical condition, placing him at risk of serious physical harm.

154. Defendants Santini and Mohr knew or were aware that the Plaintiff faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it, including but not limited to, providing more catheters, obtaining appropriate catheters, or providing enemas or the assistance of a trained medical professional.

155. When the Plaintiff alerted Defendants Santini and Mohr to his need for medical assistance, and when they discovered and/or confirmed such needs through Wellpath's own

internal alerts and referral processes along with extensive medical documentation reviewed by the Defendants, Defendants Santini and Mohr acted with deliberate indifference to the Plaintiff's readily apparent need for medical attention and his constitutional rights by refusing to obtain and provide medical treatment for him.

156. All of the deliberately indifferent acts of Defendants Santini and Mohr were conducted within the scope of their official duties and employment.

157. The acts or omissions of Defendants Santini and Mohr were the legal and proximate cause of the Plaintiff's injuries.

158. The acts and omissions of Defendants Santini and Mohr caused Plaintiff damages in that he suffered extreme physical and mental pain and injuries while he was entrusted to the Defendants' care.

159. The intentional actions and inactions of Defendants Santini and Mohr as described herein intentionally deprived the Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the laws of the State of Colorado, and caused his other damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Violation**
**Entity Liability**
**(Against Defendant Wellpath, LLC)**

160. Plaintiff hereby incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

161. Wellpath is a person within the meaning of 42 U.S.C. § 1983.

162. At all relevant times, Wellpath was acting under color of state law as the functional equivalent of a municipality providing medical care to detainees in the EPCJ.

163. The intentional acts or omissions of Wellpath were conducted within the scope of its official duties and operations.

164. Wellpath acted with deliberate indifference and unconstitutional policies, customs, and/or practices regarding the treatment of individuals with disabilities and the provision of constitutionally adequate medical care, which was the moving and proximate cause of the Plaintiff's suffering and injuries.

165. Wellpath was deliberately indifferent in its failure to adequately staff, properly train and supervise its employees to provide necessary medical care to detainees in the EPCJ as illustrated by, among other things:

a) Wellpath's systemic staffing failures that affected the Plaintiff's ability to receive Chronic Care, ADA/Special Needs interventions, receive timely and meaningful sick call appointments, and access necessary medications, medical equipment, and mobility tools;

b) Wellpath's failure to provide or obtain appropriate catheters for the Plaintiff;

c) Wellpath's failure to provide or obtain any enemas for the Plaintiff;

d) Defendant Mohr's failure to treat the Plaintiff's infection and bowel movement issues during a sick call appointment days prior to the Plaintiff's hospitalization;

e) Defendant Santini's failure to address the Plaintiff's issues with catheterization which caused an infection requiring hospitalization and antibiotics and Defendant Santini's failure to provide any medical care to the Plaintiff;

f) Wellpath employees' failure to medically supervise the Plaintiff's Foley catheter;

g) The disregard of the Plaintiff's concerns about the lack of medical care he was receiving, as evidenced in his kites and communicated during sick call appointments;

h) Wellpath employees' failure to treat the Plaintiff's fecal impaction;

i) Wellpath employees' failure to address the Plaintiff's concerns about nightly seizures.

166. The failures in training, supervision, staffing, and policy regarding providing necessary medical supervision, care, and intervention were so obvious that the failure to provide the same was deliberately indifferent to the rights of the Plaintiff and other detainees.

167. Wellpath ratified its employees' decisions and unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known and widespread culture of failing to provide long-term or Chronic Care and ignoring the serious medical needs of individuals detained at the EPCJ, allowing such extreme and systemic staffing shortages such that they inhibited the basic day-to-day functioning of the medical care within the facility (as evidenced by having only one person to hand out medicine for the entire jail and thereby failing to actually deliver prescription medications), and failing to ensure necessary medical supplies were available at the EPCJ.

168. Wellpath's policies, practices, habits, customs, and lack of training, supervision, and staffing that resulted in the failure to provide adequate medical care to treat the Plaintiff's known serious medical needs were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

169. The policies, customs, and practices of Wellpath as described herein were moving forces in and proximate causes of the deprivation of the Plaintiff's right to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

170. Wellpath knew or should have known that its failure to properly train and supervise employees was substantially certain to result in constitutionally inadequate medical care, yet it consciously and/or deliberately chose to disregard the substantial risk of serious harm to detainees.

**THIRD CLAIM FOR RELIEF**
**Medical Negligence Causing Serious Bodily Harm**
**(Against Defendants Wellpath, LLC, Santini, and Mohr)**

171. Plaintiff hereby incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

172. Plaintiff brings this claim against Defendants Wellpath, Santini, and Mohr.

173. Defendant Wellpath is a private corporation that contracts to provide medical and mental health care services to detainees and inmates at the EPCJ.

174. Defendant Wellpath is not a government actor and as such is not entitled to any immunity under the CGIA.

175. Defendant Wellpath is vicariously liable for the negligent acts and omissions by its agents and/or employees, whether or not they are defendants to this claim.

176. At all times relevant to this action, the Plaintiff was under the medical responsibility, care, and treatment of these Defendants.

177. All Wellpath employees who interacted with the Plaintiff during his detainment at the EPCJ had doctor-patient, counselor-patient, or nurse-patient relationships with the Plaintiff, and at all times relevant hereto were acting within the scope of their employment.

178. Defendant Wellpath and its employees owed Plaintiff a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical professionals in similar situations.

179. Through their actions and omissions, Defendants breached the standards of care and were negligent in failing to properly treat and care for Plaintiff, including, without limitation, the following:

    a. failing to adequately address Plaintiff's disability and resulting limitations;

    b. failing to provide Plaintiff with the necessary medical tools to manage his paraplegia and related medical conditions;

    c. failing to prescribe Plaintiff necessary medications;

    d. failing to diagnose and treat Plaintiff's infection;

    e. forcing Plaintiff to use catheters that were too large and caused urethral bleeding and injury to his penis; and

    f. failing to supervise the Plaintiff's use of a Foley catheter.

180. The duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

181. Defendant Wellpath also had a duty to implement reasonable policies and exercise reasonable care in the training of its employees in the EPCJ.

182. Defendant Wellpath breached this duty by failing to exercise reasonable care in the training of its employees in a manner that provided the Plaintiff with reasonable medical treatment, failing to adequately staff the jail, and failing to ensure sufficient supplies were maintained at the jail.

183. The negligent acts and omissions by the Defendants were a substantial and significant proximate cause of Plaintiff's pain and suffering, including infection, fecal impaction, injury, upset, grief, and anger.

184. Plaintiff is entitled to general and compensatory damages for such pain and suffering, emotional distress, loss of enjoyment of life, together with all other damages allowable by law in amounts to be proven at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

    a.  All appropriate relief at law and equity;

    b.  Economic losses on all claims allowed by law;

    c.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

    d.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.  Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

f.  Pre- and post-judgment interest at the highest lawful rate; and

g.  Any further relief that this Court deems just and proper; and any other relief as allowed by law.

Plaintiff respectfully requests trial by jury.

DATED this 30th day of September, 2022.

HIGHLANDS LAW FIRM

/s/ *Zachary D. Warren*
Zachary D. Warren, #49817
Annika K. Adams, #56516
501 South Cherry Street
11th Floor
Denver, Colorado 80209
Phone:  (720) 722-3880
Fax:     (720) 815-3380
zwarren@highlandslawfirm.com
aadams@highlandslawfirm.com
*Counsel for Plaintiff*
